IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EDITH IHEGWORD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY HOSPITAL DISTRICT | § | CIVIL ACTION NO. H-10-5180 |
| d/b/a BEN TAUB GENERAL HOSPITAL | § | |
| d/b/a LYNDON BAINES JOHNSON | § | |
| GENERAL HOSPITAL d/b/a QUENTIN | § | |
| MEASE COMMUNITY HOSPITAL d/b/a | § | |
| VARIOUS COMMUNITY HEALTH CENTERS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Edith Ihegword, brings this action against defendant, Harris County Hospital District d/b/a Ben Taub General Hospital d/b/a Lyndon Baines Johnson General Hospital d/b/a Quentin Mease Community Hospital d/b/a Various Community Health Centers ("HCHD"), for (1) national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 41 U.S.C. § 2000e, et seq., (2) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., (3) failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. and Chapter 61 of the Texas Labor Code, and

(4) retaliation.[1]  Pending before the court are Defendant Harris County Hospital District's Motion for Summary Judgment and Supporting Memorandum of Law (Docket Entry No. 46), and Defendant's Motion to Strike and Objections to Plaintiff's Declaration in Response to Defendant's Motion for Summary Judgment (Docket Entry No. 60).  After having carefully considered Plaintiff's Response to Defendants' Motion for Summary Judgment (Docket Entry No. 58) and Plaintiff's Response to Defendants' Motion to Strike and Objections to Plaintiff's Declaration in Response to Defendants' Motion for Summary Judgment (Docket Entry No. 64), as well as Defendant Harris County Hospital District's Reply to Plaintiff's Response to defendant's Motion for Summary Judgment (Docket Entry No. 59), the court concludes that defendant's motion for summary judgment should be granted, and that defendants' motion to strike and objections to plaintiff's declaration should be denied.

## I.  Factual and Procedural Background

Plaintiff is a nurse who began her employment with HCHD in 1988 at Ben Taub Hospital.[2]  Plaintiff's national origin is

---

[1]See Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 58 ("In responding to Defendants' Motion, Ihegword voluntarily withdraws her claims for hostile work environment and race discrimination under sections 1981 and 1983.").

[2]Video Deposition of Edith Ihegword ("Plaintiff's Deposition"), Exhibit 1 to Defendant Harris County Hospital District's Motion for Summary Judgment and Supporting Memorandum of Law ("Defendant's Motion for Summary Judgment"), Docket Entry No. 46, pp. 10:17-22 and 13:5-7.

Nigeria.[3]  In 2002 plaintiff transferred to Quentin Mease Community Hospital ("Quentin Mease") to work in the Geriatric Progressive Care Unit ("GPCU").[4]  In 2006 Jimmie Anglin became the plaintiff's supervisor when she took over the role of Nurse Manager for the GPCU.[5]  Anglin is an African-American female.[6]  During the relevant period Anglin reported to Celeste McLaughlin, Quentin Mease's Assistant Director of Nursing.[7]

During her employment with HCHD, plaintiff suffered from osteoarthritis of her knees.[8]  In late 2007 plaintiff requested a modified work schedule as a reasonable accommodation for her osteoarthritis.  Defendant granted plaintiff's request for a modified work schedule effective December 2, 2007.[9]

---

[3]Id. at 9:19-20 and 314:5-10.

[4]Id. at 13:17-18, 14:22-24, 15:16-18.

[5]Id. at 15:25-16:19.  See also Oral Videotaped Deposition of Jimmie Anglin ("Anglin Deposition"), Exhibit 2 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 164:1-18.

[6]Plaintiff's Response, Docket Entry No. 58, p. 2.

[7]Plaintiff's Deposition, Exhibit 1 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 17:9-11 and 352:19-20; Oral Deposition of Celeste McLaughlin ("McLaughlin Deposition"), Exhibit 3 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 9:13-15.

[8]Plaintiff's Deposition, Exhibit 1 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 326:23-327:10.

[9]Id. at 337:14-338:12; Anglin Deposition, Exhibit 2 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 165:4-166:8, 194:7-23; McLaughlin Deposition, Exhibit No. 3 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 36:15-37:13.

On March 26, 2009, Anglin counseled plaintiff and placed her on a 90-day probation for taking lunch breaks that exceeded the 30-minute period allowed by the HCHD.[10] Plaintiff filed a grievance arguing that she should not have been disciplined for taking long lunches and received a hearing on her grievance.[11]

On May 29, 2009, HCHD discharged plaintiff from her employment.[12] Plaintiff filed a grievance with HCHD arguing that she should not have been discharged, and received two hearings at which she was assisted by a union representative.[13] The Grievance Panel upheld plaintiff's discharge.[14]

On July 30, 2009, plaintiff filed a Charge of Discrimination with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC") alleging discrimi-nation on the basis of national origin in violation of Title VII of

---

[10]Employee Counseling Form, Exhibit 18 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[11]Declaration of Edith Ihegword, Exhibit 1 to Plaintiff's Response ("Plaintiff's Declaration"), Docket Entry No. 58, pp. 6-7 ¶¶ 22-23.

[12]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46. See also Plaintiff's Deposition, Exhibit 1 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 20; Anglin Deposition, Exhibit 2 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 179:20-180:4, and McLaughlin Deposition, Exhibit 3 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 104:4-110:23.

[13]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, pp. 10-12 ¶¶ 40-46.

[14]Id. ¶¶ 41, 44-46.

the Civil Rights Act of 1964 as amended, and discrimination on the basis of disability in violation of the ADA.[15]  Plaintiff also complained that she had been "subjected to retaliation for complaining of violations of these Acts."[16]

## II.  **Defendant's Motion for Summary Judgment**

Defendant argues that it is entitled to summary judgment on plaintiff's claims because she is unable to cite evidence capable of raising a genuine issue of material fact for trial.

## A.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S.Ct.

---

[15]EEOC Charge, Exhibit 30 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[16]Id.

2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case."  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>) (per curiam) (quoting <u>Celotex</u>, 106 S.Ct. at 2553-2554).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.  <u>Id.</u> (citing <u>Celotex</u>, 106 S.Ct. at 2553-2554).  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S.Ct. 2097, 2110 (2000). Unsubstantiated assertions are not competent summary judgment evidence.  <u>Forsyth v. Barr</u>, 19 F.3d 1527, 1533 (5th Cir.), <u>cert. denied</u>, 115 S.Ct. 195 (1994).  The nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. <u>Id.</u> at 1537.  District courts are under no duty "to sift through the record in search of evidence to support a party's opposition to summary judgment."  <u>Id.</u> (quoting <u>Skotak v. Tenneco Resins, Inc.</u>, 953 F.2d 909, 915-16 & n.7 (5th Cir.), <u>cert. denied</u>, 113 S.Ct. 98 (1992)).  Factual controversies are to be resolved in favor of the

nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

**B.   Plaintiff's Disability Discrimination Claim Fails**

Plaintiff alleges that the HCHD discriminated against her on the basis of disability by "refus[ing] to allow [her] requested reasonable accommodation."[17]   Defendant argues that plaintiff's disability discrimination claim fails because HCHD provided her the only reasonable accommodation she ever sought:  a modified work schedule.

    1.   Plaintiff Cannot Defeat Summary Judgment with New Theory

Without disputing HCHD's argument that her request for a reasonable accommodation was granted, plaintiff responds that her disability claim is not based on HCHD's failure to grant her request for a reasonable accommodation but, instead, "that she was terminated because of her disability, [because of] her request for an accommodation, and because of her complaints to upper management and Human Resources when Ms. Anglin failed to address her accommodation request."[18]

The argument that her disability discrimination claim is not based on HCHD's alleged failure to provide her a reasonable

---

[17]Plaintiffs' Original Complaint, Docket Entry No. 1, p. 12 ¶ 89.

[18]Plaintiff's Response, Docket Entry No. 58, p. 19.

accommodation but, instead, on HCHD's decision to discharge her has
no merit because plaintiff's complaint expressly alleges disability
discrimination based on HCHD's alleged failure to provide her a
reasonable accommodation, not on HCHD's decision to discharge her.
Under the heading "Disability Discrimination in Violation of the
Americans with Disabilities Act of 1990" Plaintiffs' Original
Complaint alleges:

> 87. Defendants are an employer that at all relevant
>     times were subject to the requirements of the
>     Americans with Disabilities Act of 1990 ("ADA").
>
> 88. Plaintiff informed Defendants of her need for a
>     reasonable accommodation due to her disability.
>
> 89. Defendants refused to allow the requested
>     reasonable accommodation.
>
> 90. Defendants have thus violated the ADA as to
>     Ms. Ihegword.[19]

Because a properly pleaded complaint must give "fair notice of what
the . . . claim is and the grounds upon which it rests," Ashcroft
v. Iqbal, 129 S.Ct. 1937, 1961 (2009), the fact that plaintiff's
original complaint alleges that HCHD discriminated against her on
the basis of her disability by failing to provide her a reasonable
accommodation, and did not allege that HCHD discharged her because
of her disability, precludes plaintiff from using her discharge as
a means to defeat HCHD's motion for summary judgment on her
disability discrimination claim.   See Cutrera v. Board of

---

[19]Plaintiffs' Original Complaint, Docket Entry No. 1, p. 12
¶¶ 87-90.

Supervisors of Louisiana State University, 429 F.3d 108, 113 (5th
Cir. 2005) (courts disregard claims raised not in a complaint but
in response to a  motion for summary judgment).

> 2.   Plaintiff Received the Modified Work Schedule that She
>      Sought as a Reasonable Accommodation

The ADA requires employers to make "reasonable accommodations
to the known physical or mental limitations of an otherwise
qualified individual with a disability . . . unless [the employer]
can demonstrate that the accommodation would impose an undue
hardship."  42 U.S.C. § 12112(b)(5)(A).  Defendant argues that it
is entitled to summary judgment on plaintiff's disability
discrimination claim because plaintiff received the modified work
schedule that she sought as a reasonable accommodation.  Plaintiff
argues that HCHD is not entitled to summary judgment on this claim
because in the fall of 2007 when plaintiff requested an
accommodation Anglin refused her request, and plaintiff's request
was granted only after plaintiff "took her request for an
accommodation above Ms. Anglin, and sought the assistance of
Ms. McLaughlin, as well as Human Resources, forcing Ms. McLaughlin
to address the issue."[20]

Undisputed evidence shows that in October or November of 2007
plaintiff requested a modified work schedule, that on November 29,
2007, plaintiff accepted a work schedule that provided her a

---

[20]Plaintiff's Response, Docket Entry No. 58, pp. 19-20, and
Exhibit 1 thereto, Plaintiff's Declaration, ¶¶ 13-16.

modified schedule that would be effective as of December 2, 2007,[21] that on December 20, 2007, plaintiff's doctor provided a note substantiating her need for a modified work schedule that allowed her to work no more than two twelve-hour shifts followed by at least two days of rest,[22] and that on December 29, 2007, Anglin signed the modified schedule and it remained in effect until plaintiff's discharge on May 29, 2009.[23]   In her declaration plaintiff expressly states that "the schedule made by Ms. McLaughlin . . . I accepted because it did meet my doctor's minimum requirements."[24]   Because there is no dispute that HCHD provided plaintiff the accommodation she requested even before she provided HCHD with a note from her doctor substantiating her need for the modified schedule, no fact issue exists to preclude summary judgment on plaintiff's claim that HCHD either failed to provide her a reasonable accommodation or failed to provide her a reasonable accommodation in a timely manner.

_____

[21]Proposed Schedule for Edith Ihegword, Exhibit 6 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[22]Exhibit 29 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[23]See the following exhibits to Defendant's Motion for Summary Judgment, Docket Entry No. 46:  Exhibit 1, Plaintiff's Deposition, pp. 345:6-346:1; Exhibit 2, Anglin Deposition, pp. 79:18-80:1; Exhibit 3, McLaughlin Deposition, pp. 38:17-40:1; and Exhibit 6, Proposed Schedule for Edith Ihegword.

[24]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, ¶ 15.

**C.   Plaintiff's National Origin Discrimination Claim Fails**

Plaintiff alleges that HCHD discriminated against her on the basis of her national origin, Nigeria, by discharging her in violation of Title VII.[25] Defendant argues that it is entitled to summary judgment on plaintiff's Title VII claim for national origin discrimination because plaintiff is unable to establish a <u>prima facie</u> case of discrimination and is unable to raise a genuine issue of material fact for trial as to whether HCHD intentionally discriminated against her on the basis of her national origin.

    1.   <u>Applicable Law</u>

Title VII prohibits employers from taking adverse employment actions against employees on the basis of national origin. Plaintiffs in Title VII cases may rely on either direct or circumstantial evidence.  <u>See</u> <u>Wallace v. Methodist Hosp. System</u>, 271 F.3d 212, 219 (5th Cir. 2001), <u>cert. denied</u>, 122 S.Ct. 1961 (2002).

    2.   <u>Application of the Law to the Undisputed Facts</u>

        (a)   Plaintiff Fails to Present Direct Evidence of National Origin Discrimination

"Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption."  <u>Portis v. National Bank of New Albany, Mississippi</u>,

---

[25]Plaintiffs' Original Complaint, Docket Entry No. 1, pp. 10-11 ¶¶ 73-80.

34 F.3d 325, 328-29 (5th Cir. 1994). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." Id. at 329. See also Rubinstein v. Administrators of Tulane Education Fund, 218 F.3d 392, 402 (5th Cir. 2000), cert. denied, 121 S.Ct. 1393 (2001) (finding that a dean's testimony that he denied a professor a pay raise because the professor filed a discrimination suit against the university "could be no more direct on the issue of retaliation"). "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other case where a plaintiff meets his burden." Nichols v. Loral Vought Systems Corp., 81 F.3d 38, 40 (5th Cir. 1996) (citing Portis, 34 F.3d at 328 n.6).

Asserting that her immediate supervisor, Anglin, made discriminatory statements about Nigerians in 2006, soon after she became plaintiff's supervisor, and that Anglin influenced the defendant's decision to discharge her, plaintiff argues that Anglin's statements are evidence that HCHD's decision to discharge her was discriminatory. In support of this argument, plaintiff offers her own declaration that:

> 4.  In 2006, Jimmie Anglin became my supervisor. Ms. Anglin is an African-American female and she specifically expressed that she did not like me or the rest of the Nigerians who worked for her because she indicated that she could not "trust" us. I did not work regularly with Ms. Anglin prior to her becoming my supervisor and I had never given her any cause to distrust me, yet, as early as

2006, she indicated that she needed to get rid of us, meaning the Nigerians in her employ.

5.   In 2006, shortly after becoming my supervisor, Ms. Anglin was investigated by HCHD. I do not know what HCHD was investigating, only that an investigation took place. After the investigation, Ms. Anglin made the comment that she could not trust Nigerians. In fact, while I was charting with a coworker, Henriette Nlemchi, in the hallway by her door, we overheard Ms. Anglin make the comment that "she will do everything in her power to get rid of these Nigerians" while having a conversation with her friends. I do not know the people who Ms. Anglin was speaking to, but they did not work in my unit. However, both Ms. Nlemchi and I heard Ms. Anglin made the statement that she would do anything to get rid of us.

6.   I did not confront Ms. Anglin at this time because I was afraid to lose my job. I love nursing and had been at HCHD since 1989 so felt I could not come forward without risking my career. Importantly, Ms. Nlemchi and I both testified in a grievance hearing, prior to her untimely death, that she heard Ms. Anglin make those comments and while Ms. Anglin could have rebutted that she made the statement, she did not rebut it.[26]

Plaintiff also states that:

7.   After the investigation, Ms. Anglin began discriminating against me by failing to follow HCHD's policy on vacation time. Specifically, Ms. Anglin denied the Nigerian employees who had seniority vacation days and allowed less senior employees who are African-American to take those dates. I was one of the most senior out of anyone in the unit, but Ms. Anglin would ensure that her African-American associates obtained the vacation days they wanted, while denying me vacation requests. I should have had seniority privilege, but Ms. Anglin simply ignored that and gave people with less seniority the premium vacation days.

---

[26]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, ¶¶ 4-6.

8.    However, that is not the only manner in which
      Ms. Anglin discriminated against me.   Ms. Anglin
      also assigned part-time and Registry nurses as the
      Charge nurse on the unit, even though this is a
      violation of HCHD policy.   The reason this is
      important is because the Charge Nurse receives
      additional pay, therefore HCHD has a policy
      regarding who can be the assigned as a Charge Nurse
      in each unit.   HCHD made Ms. Anglin stop this
      practice.   However, it does not change the fact
      that she would assign nurses who were not qualified
      to be Charge Nurse simply so she could deny
      Nigerian nurses extra pay to which they were
      otherwise entitled.   While HCHD now claims that
      Ms. Anglin obtained permission to disregard the
      policy as to who was assigned as Charge Nurse, it
      is undisputed that Brenda McDaniel was allowed to
      act as a Charge Nurse and received additional pay
      even though she was not authorized to act as Charge
      Nurse or receive extra pay under HCHD policy.   It
      is also undisputed that Ms. Anglin could have
      assigned a number of other individuals that
      position without breaking policy.

9.    Ms. Anglin also denied me the ability to make up my
      time when I had to go to doctor appointments or
      when I would call in sick.   I have osteoarthritis
      in my knees and began experiencing severe problems
      with my knees as early as 2000 while working for
      HCHD.   However, I had severe issues in 2007 and
      while Ms. Anglin allowed the African-Americans,
      Asians and Caucasians on staff to simply take the
      time off, I had to "make up" the time I missed from
      calling in due to my knees flaring up.

10.   Ms. Anglin also spoke to me in a rude,
      condescending tone that she did not use when
      speaking to American colleagues.   I complained
      about the[] way Ms. Anglin spoke to me and other
      foreign employees, but my complaints were ignored
      by HCHD.

11.   Ms. Anglin also made a point of leaving me out of
      the loop.   For example, when HCHD would have
      contests or ask for recommendations for awards, she
      would not inform me about the contests, so that I
      could not take part.   It is my understanding that

-14-

> Ms. Anglin left my fellow Nigerians out of the loop
> as well.[27]

HCHD argues that the plaintiff's evidence should be disregarded "given the lack of any temporal connection between Anglin's alleged comment and Ihegword's termination."[28] HCHD argues that "as Anglin purportedly made the comment in 2006 and HCHD terminated Ihegword in May 2009, Ihegword cannot rely on the comment to create a fact question on her national origin discrimination claim."[29]

The Fifth Circuit has explained that workplace remarks may constitute evidence of discrimination if they are

> "1) related [to the protected class of persons of which
> the plaintiff is a member]; 2) proximate in time to the
> [complained-of adverse employment decision]; 3) made by
> an individual with authority over the employment decision
> at issue; and 4) related to the employment decision at
> issue."

Rubenstein, 218 F.3d at 401 (quoting Brown v. CSC Logic, Inc., 82 F.3d 651, 655 (5th Cir. 1996), abrogated in part on other grounds by Russell v. McKinney Hospital Venture, 235 F.3d 219, 225 (5th Cir. 2000). See also Palasota v. Haggar Clothing Co., 342 F.3d 569, 577 (5th Cir. 2003). If the comments fail to meet these criteria, e.g., if they are vague and remote in time, or the

---

[27]Id. ¶¶ 7-11.

[28]Defendant Harris County Hospital District's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, ("Defendant's Reply") Docket Entry No. 59, p. 12 n.10.

[29]Id.

-15-

speaker has no authority or influence over the employment decisions, they are merely stray remarks that are not sufficient to establish discrimination. See Brown, 82 F.3d at 655. See also Krystek v. University of Southern Mississippi, 164 F.3d 251, 256 (5th Cir. 1999). "In contrast, specific comments made over a lengthy period of time are sufficient." Brown, 82 F.3d at 655-56. Although the Fifth Circuit no longer uses the four-prong CSC Logic test when remarks are submitted as evidence of pretext in cases based on indirect, circumstantial evidence, the Fifth Circuit continues to use this four-prong test "when a remark is presented as direct evidence of discrimination." Laxton v. Gap, Inc., 333 F.3d 572, 583 (5th Cir. 2003) ("We continue to apply the CSC Logic test when a remark is presented as direct evidence of discrimination apart from the McDonnell Douglas framework.").

Accepting plaintiff's argument that in 2006 she overheard Anglin state that she could not trust Nigerians and that she would do everything in her power to get rid of Nigerians, the court is unable to conclude that plaintiff has produced direct evidence that her discharge was motivated by national origin discrimination. While Anglin's statements were related to plaintiff's national origin and were made by plaintiff's immediate supervisor, undisputed evidence establishes that the decision-maker who discharged plaintiff was not Anglin, but McLaughlin. Moreover, plaintiff has failed to present any evidence showing that Anglin made the discriminatory statements about Nigerians either proximate

-16-

in time to or in relation to plaintiff's discharge.  Accordingly,
the court concludes that Anglin's statements about Nigerians are
not direct evidence that plaintiff's termination was caused by
animus for her national origin and, therefore, do not raise a fact
issue for trial.

> ### (b)  Plaintiff Fails to Present Circumstantial Evidence of National Origin Discrimination

In circumstantial evidence cases courts apply the burden-
shifting analysis stated in McDonnell Douglas Corp. v. Green, 93
S.Ct. 1817 (1973).   To establish a prima facie case of
discriminatory discharge the plaintiff must demonstrate that
(1) she belongs to a protected class, (2) she was qualified for the
job from which she was discharged, (3) despite her qualifications
she was discharged, and (4) she was replaced by someone outside of
her protected class or someone from outside her protected class was
treated more favorably under nearly identical circumstances.  McCoy
v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).  Once the
plaintiff establishes a prima facie case a presumption of discrimi-
nation arises and the burden of production shifts to the defendant
to offer evidence of a legitimate, non-discriminatory reason for
the actions at issue.  Id. at 557.  The employer's burden is only
one of production, not persuasion, and involves no credibility
assessment.  If the defendant meets this burden, the presumption of
discrimination created by the prima facie case disappears, and the

burden shifts to the plaintiff to show the pretextual nature of the defendant's proffered reason.  Id.  Pretext may be established "by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003).  To carry this burden the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.  McCoy, 492 F.3d at 557.  The relevant inquiry in determining whether the employer's legitimate, non-discriminatory reason for termination is pretextual "is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."  Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995).

> [E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.  We do not try in court the validity of good faith beliefs to an employee's competence.  Motive is the issue . . . [A] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.

Id. (quoting Little, 924 F.2d at 97).  In this case nothing in the record creates a fact issue as to whether HCHD's discharge of plaintiff's employment was made with a discriminatory motive.

### (1)   Plaintiff Fails to Establish a Prima Facie Case

Defendant does not dispute that plaintiff belongs to a protected class whose national origin is Nigeria, that plaintiff's discharge was an adverse employment action, or that plaintiff was

qualified for the job from which she was discharged.  Instead,
citing Wyvill v. United Companies Life Ins. Co., 212 F.3d 296 (5th
Cir. 2000), cert. denied, 121 S.Ct. 1081 (2001), defendant argues
that plaintiff is unable to establish the fourth prong of the prima
facie case, i.e., that she was replaced by someone outside of her
protected class or that someone from outside her protected class
was treated more favorably under similar circumstances.[30]  Asserting
that plaintiff "lacks evidence of . . . a proper comparator,"
defendant argues that plaintiff "cannot demonstrate a genuine issue
of material fact on the fourth prong of the prima facie case
necessary to avoid summary judgment."[31]  In Wyvill, 212 F.3d at 304,
the Fifth Circuit explained that "[t]o establish a claim of
disparate treatment, [the plaintiff] must show that [the defendant]
gave preferential treatment to a[n] . . . employee [outside of the
plaintiff's protected class] under 'nearly identical'
circumstances."  In Lee v. Kansas City Southern Railway Co., 574
F.3d 253, 260 (5th Cir. 2009), the Fifth Circuit explained that
"under nearly identical circumstances," means that "when the
employees being compared held the same job or responsibilities,
shared the same supervisor or had their employment status
determined by the same person, and have essentially comparable
violation histories."

---

[30]Defendant's Motion for Summary Judgment, Docket Entry No. 46,
pp. 16-17.

[31]Id.

Plaintiff responds that she

> easily makes this showing.  First, it is undisputed that
> Plaintiff is of Nigerian national origin.  Second, it is
> also undisputed that Plaintiff was terminated from her
> position with the Defendant.  Finally . . . the evidence
> demonstrates an animus on the part of Ms. Anglin toward
> the Nigerian employees.[32]

Plaintiff's response fails to cite evidence capable of establishing the fourth prong of her _prima facie_ case because plaintiff fails to cite evidence showing either that following her discharge she was replaced by someone outside of her protected class, i.e., that her position was filled by a non-Nigerian, or that someone from outside her protected class was treated more favorably than she under nearly identical circumstances, i.e., that HCHD did not discharge a non-Nigerian nurse who had a performance history similar to hers.  See Werner v. Department of Homeland Security, 441 F. App'x 246, 249-50 (5th Cir. 2011) (upholding summary judgment for defendant because plaintiff failed to satisfy the fourth prong of the _prima facie_ case by showing that any comparator had a similar violation history to hers).

The closest plaintiff comes to identifying a similarly situated non-Nigerian nurse who was treated differently under similar circumstances is plaintiff's contention that she was discharged for failing to respond to a patient call light on May 16, 2009, but that Ms. Carter, a non-Nigerian nurse who

---

[32]Plaintiff's Response, Docket Entry No. 58, p. 20.

similarly failed to respond to the same patient call light, was not discharged.[33]   Asserting that one of the stated reasons for her discharge was her "[f]ailure to properly supervise and assist fellow nurses with patient care on May 16, 2009,"[34] plaintiff complains that "Ms. Carter, who is not Nigerian, and who has not requested an accommodation for any disability, was not terminated, or even written up for the [May 16, 2009] incident even though it was Ms. Carter's patient."[35]   Plaintiff explains that

> [o]n May 16, 2009, [she] was working as the Charge Nurse. Exhibit 1. A call light came on for one of Ms. Carter's patients as [plaintiff] was returning to the desk from waiting on a patient.  Exhibit 1.  Ms. Carter was standing at the desk at the time the call light came on. Ms. Carter went to the door to the patient's room, and then yelled to [plaintiff], "Ms. Edith, didn't you hear the call light?"  Exhibit 1.  [Plaintiff] asked her what Ms. Carter was talking about since she was standing outside the patient's door at this point in time. [Plaintiff] did not respond to the call light since Ms. Carter was already at the patient's door.  Exhibit 1. Ms. Carter then approached [plaintiff], got in [pliantiff's] face and called her a bitch, scaring her. Exhibit 1.  [Plaintiff] told Ms. Carter that she was going to tell Ms. Anglin about this incident. [Plaintiff] then summarized what happened and placed the note under Ms. Anglin's door.  Exhibit 1. . .
>
>                               . . .
>
>      [Plaintiff] and Ms. Carter are both Registered Nurses.  They are both accountable for answering call lights.  Exhibit 1.  In fact, under their unit's

------

[33]Id. at 12-13.

[34]Plaintiff's Response, Docket Entry No. 58, p. 13 (citing Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46).

[35]Id. at 13.

procedures, since it was Ms. Carter's patient she should
have answered the call light, or gotten on the intercom
to explain that she needed someone else to cover the call
light.  Exhibit 1.  She did not do this.  Accordingly, if
[plaintiff] ignored the patient call light for six
minutes, Ms. Carter did also.  Yet, Ms. Carter, who is
not Nigerian, and who has not requested an accommodation
for any disability, was not terminated, or even written
up for the incident even though it was Ms. Carter's
patient. McLaughlin Depo., p. 122; Anglin Depo., p. 141.
Curiously, it is now uncontested that the patient was
waited on long before Ms. Carter turned the call light
off.  Exhibit 1.  In fact, HCHD knew that Ms. Carter
attended to the patient, yet purposefully left the call
light on after caring for the patient, in order to set
[plaintiff] up by seeing "what Ms. Edith would do."
Exhibit 1; Anglin Depo., p. 141; McLaughlin Depo.
pp. 110-112.  Therefore, management knew that neither
[plaintiff] nor Ms. Carter left the patient without care
for six minutes, and that Plaintiff did absolutely
nothing wrong with respect to that incident (hence the
reason for why Plaintiff was never reprimanded over the
incident).  Notably, as Ms. Anglin explained it, in her
opinion, the issue is why Plaintiff did not answer the
call light.  Anglin Depo., pp. 144-147.  Yet, Anglin
candidly admitted that she has no idea why Plaintiff did
not answer the call light (even though Plaintiff had
explained that the reason for why she did not answer the
call light was because she observed Ms. Carter enter the
patient's room to attend to the patient).  Nevertheless,
despite all of that, HCHD later terminated Plaintiff for
her alleged failure to answer this call light.
Defendant's Exhibit 19; Anglin Depo., pp. 144-147. . .[36]

Plaintiff's description of the May 16, 2009, incident shows

that it involved a dispute between her and Ms. Carter over timely

response to a patient call light.  Plaintiff's description of the

incident shows that neither she nor Ms. Carter was disciplined for

failure to timely respond to the patient call light, but that the

incident nevertheless served as an example of the "continuing poor

---

[36]Plaintiff's Response, Docket Entry No. 58, pp. 12-14.

job performance" for which she was discharged.[37] Plaintiff compares herself to Ms. Carter who is not Nigerian and who plaintiff contends was treated more favorably than plaintiff following that incident, but plaintiff has not offered any evidence demonstrating that Ms. Carter had a disciplinary record or a history of altercations with her coworkers that was nearly identical to plaintiff's. Because plaintiff has failed to present any evidence showing that Ms. Carter's performance history was similar to her own, plaintiff cannot rely on Ms. Carter as a comparator for the purpose of establishing the fourth prong of her prima facie case. Accordingly, the court concludes that plaintiff has failed to establish the fourth prong of her prima facie case because she has failed to identify anyone from outside her protected class who was treated more favorably than she under nearly identical circumstances.

### (2) Plaintiff Fails to Raise a Fact Issue as to Whether Stated Reasons for Her Discharge Were Pretexts for National Origin Discrimination

Plaintiff was discharged on May 29, 2009. The Employee Counseling Form dated May 29, 2009, states the following reasons for the conference during which plaintiff was discharged:

REASONS FOR CONFERENCE . . .

Examples of continuing poor job performance:

---

[37]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

-Misrepresented that she provided patient education on use of feeding tube on March 16 during grievance hearing[38]

-Failure to properly supervise and assist fellow nurses with patient care on May 16, 2009. . .

-Argumentative and insubordinate with Nurse Manager regarding patient assignments on February 27 and May 22, 2009

Loss of confidence

Inability to get along with co-workers

RECOMMENDATION(S) FOR IMPROVEMENT:
    [Blank]

ACTION(S) TAKEN: Immediate termination[.][39]

Plaintiff does not dispute that the reasons for her discharge stated on the May 29, 2009, Employee Counseling Form are legitimate, non-discriminatory reasons but argues, instead, that they are pretexts for national origin discrimination.  Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  Laxton, 333 F.3d at 578.

                    (i)  No Fact Issue as to Falsity of Stated
                         Reasons for Her Discharge

    Asserting that the reasons for her discharge stated on the May 29, 2009, Employee Counseling Form are not true but are, instead, pretexts for discrimination, plaintiff argues that she

_____

    [38]The typewritten dates of "2 or March 3" were crossed out and the numeral "16" is handwritten above the crossed out dates on the Employee Counseling Form.

    [39]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

has substantial evidence that the reason articulated by Defendants is false, and is simply a pretext for the unlawful discrimination and retaliation against Ms. Ihegword. As fully set forth above, HCHD embarked on a mission to terminate Plaintiff from her position. HCHD did this by failing to follow its own policies regarding disciplinary actions by penalizing Plaintiff for issues that had previously been addressed in accordance with the policy. In other situations, HCHD fabricated issues, failed to investigate the issues, and simply ignored Plaintiff's evidence of what actually occurred, such that a reasonable juror could conclude that no reasonable person in HCHD's position would have terminated Plaintiff for the allegations at issue. Accordingly, summary judgment is improper and must be denied.[40]

The only evidence that plaintiff offers to contradict the reasons for her discharge stated in the May 29, 2009, Employee Counseling Form, is evidence contained in her own declaration and deposition where she denies having engaged in some of the conduct cited on the Employee Counseling Form as examples of her "continuing poor job performance." Plaintiff argues that the denials contained in her declaration and deposition constitute a sufficient showing of pretext to create a genuine issue of material fact for trial on her claim of national origin discrimination. See Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2108 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"). The Fifth Circuit has held that a non-movant in a summary judgment dispute cannot satisfy her evidentiary burden simply by raising "some metaphysical doubt as to the material facts

_____

[40]Plaintiff's Response, Docket Entry No. 58, pp. 20-21.

. . ., by conclusory allegations . . ., by unsubstantiated
assertions . . ., or by only a scintilla of evidence." <u>Little</u>, 37
F.3d at 1075 (citations omitted).   "[S]ummary judgment is
appropriate in *any* case where critical evidence is so weak or
tenuous on an essential fact that it could not support a judgment
in favor of the nonmovant." <u>Id.</u>

        HCHD has offered abundant evidence that plaintiff not only
engaged in the workplace conduct cited on the May 29, 2009,
Employee Counseling Form as examples of her "continuing poor job
performance," but also that when plaintiff was discharged she was
in the midst of a 90-day probation for insubordination, and that
despite being on probation, on May 16 and again on May 22, 2009,
plaintiff engaged in disputes with both her coworkers and her
supervisor about her responsibility for performing certain duties.
Although plaintiff disputes the three examples of "continuing poor
job performance" cited on the May 29, 2009, Employee Counseling
Form, plaintiff does not dispute that she was involved in work-
related altercations with her coworkers on the dates cited; and her
own accounts of those altercations do not contradict but, instead,
corroborate defendant's contention that these altercations
exemplify plaintiff's "continuing poor job performance," and
"inability to get along with co-workers."[41]

---

[41]Termination Counseling Form, Exhibit 19 to Defendant's Motion
for Summary Judgment, Docket Entry No. 46.

The first of the three examples of plaintiff's "continuing poor job performance" is that she "[m]isrepresented that she provided patient education on use of feeding tube on March 16 during grievance hearing."[42]  This example of poor job performance is supported by an Employee Counseling Form dated March 26, 2009, pursuant to which plaintiff was placed on a 90-day probation for "insubordination — [for] not following management directive per District Policy 6.20," which pertains to the 30-minute break that plaintiff and her coworkers received for lunch.[43]  In pertinent part the March 26, 2009, Employee Counseling Form states:

- 3/2 & 3/3/09, Ms. Ihegwood was told to return to work because her lunch breaks were over.  (On 3/2/09, employee clock out @ 1411—clocked in @ 1439—she was observe[d] eating in lounge 1446. 3/09, employee clock out for lunch @ 1404—clocked in @ 1438 and at 1450 in both instances she was asked (by NM [i.e., Nurse Manager, Anglin]) to return to the floor because her lunch break was over.

- 3/11/09, email was sent to all employees—as a reminder—that this inappropriate practice was not acceptable.  Additionally, NM informed staff—their compliance would be monitored.

- 3/16/09, Ms. Ihegword clocked out @ 1502 and in @ 1532.  At 1556 Ms. Ihegword was observed still eating in the lounge.[44]

Under the heading "CONSEQUENCES FOR FAILURE TO IMPROVE" plaintiff was warned that "[f]ailure to improve may result in further

---

[42]Id.

[43]Employee Counseling Form, Exhibit 18 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[44]Id.

disciplinary action up to and including termination."[45]  Under the

heading "EMPLOYEE'S COMMENTS" is the following handwritten

statement:

> This all has come up due to retaliation of my complaint
> that Nurse Manager is showing favoritism to her friends
> — lots of staff leave off unit to buy food or smoke, etc.
> I have not seen it being addressed.  I need to put a
> Grievance complaint and would like if [an] outside
> investigator can come to unit.[46]

Plaintiff testified in her deposition and stated in her

declaration that she filed a grievance regarding the 90-day

probation that she received as a result of the March 26, 2009,

counseling for taking lunch breaks longer than 30 minutes.  In her

declaration plaintiff stated:

> 23.   I protested this write up and during my grievance
>       hearing for the write up I indicated that I
>       believed that on at least one of the occasions in
>       which Ms. Anglin allegedly saw me completing my
>       lunch break after clocking back in, that I was
>       actually providing patient training on tube
>       feeding.  I no longer remember the exact date, but
>       I do know that if the patient or his family were
>       asked, they would indicate that I had completed the
>       patient training.  However, during my termination
>       hearing, this incident was listed and HCHD claimed
>       that I lied about completing the patient training.
>       This is untrue.
>
>             .  .  .
>
> 25. .  .  .  While I did complete the patient training, I
>       can't remember which day I completed it.   HCHD
>       clearly made no attempt to contact the patient to

---

[45]<u>Id.</u>

[46]<u>Id.</u>   See also Plaintiff's Deposition, Exhibit 1 to
Defendant's Motion for Summary Judgment, Docket Entry No. 46,
p. 132:3-11.

determine if I had in fact, been telling the truth
about giving the feeding tube training.  If HCHD
had contacted the patient, the patient would have
remembered "Ms. Edith" and would have indicated
that I had, in fact, completed the patient feeding
tube training.  Since HCHD continues to claim that
I did not complete this training, it is clear that
HCHD did not contact the patient or the patient's
family.  Instead, HCHD used this as a reason for my
termination without a proper investigation.[47]

At her deposition McLaughlin testified that at plaintiff's
grievance hearing, plaintiff had said that on March 16, 2009, she
resumed her lunch break after clocking back in because her lunch
break had been interrupted for patient education on tube feeding.[48]
McLaughlin testified that she investigated plaintiff's contention
that on March 16th her lunch break had been interrupted for patient
education, and that she found that "on March 16th, there was only
one patient on the unit that had a tube feeding.  Edith was not the
nurse taking care of that patient or assigned to that patient.  And
when we looked in the records, there was no documentation that she
had ever done it."[49]

Although  plaintiff  argues  that  HCHD  falsely  stated  she
"[m]isrepresented that she provided patient education on use of

----

[47]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response,
Docket Entry No. 58, p. 7 ¶¶ 23, 25.  See also Plaintiff's
Deposition, Exhibit 1 to Defendant's Motion for Summary Judgment,
Docket Entry No. 46, pp. 276:9-278:7.

[48]McLaughlin Deposition, Exhibit 3 to Defendant's Motion for
Summary Judgment, Docket Entry No. 46, p. 88:9-10.

[49]Id. at 87:2-14.

feeding tube on March 16 during grievance hearing,"[50] plaintiff acknowledges that she does not remember the date on which she conducted the feeding tube education,[51] and plaintiff has not cited any evidence showing that she interrupted her lunch break to engage in patient education on March 16th or any of the other days on which she was observed resuming her lunch break after clocking back into work.

Because the evidence before the court regarding the events of March 2009 when plaintiff was placed on 90-day probation for having resumed her lunch breaks after clocking back into work shows that the only patient in the unit with a feeding tube had not received education from the plaintiff,[52] there is no evidence from which a reasonable factfinder could conclude that following her investigation McLaughlin did not reasonably believe that plaintiff misrepresented the reason she was seen in the lounge eating lunch after she had clocked back in from her lunch break. See Waggoner v. City of Garland, 987 F.2d 1160, 1165 (5th Cir. 1993) (recognizing that "the real issue is whether the employer reasonably believed the employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually

---

[50]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[51]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, p. 23.

[52]McLaughlin Deposition, Exhibit 3 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 87:2-14.

believe the co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal").

The second example of plaintiff's "continuing poor job performance" is that she "fail[ed] to properly supervise and assist fellow nurses with patient care on May 16, 2009."[53] Although this example of poor job performance was not the subject of an independent Employee Counseling Form, the May 16th incident is addressed at length by plaintiff in both her declaration and her deposition, and is also addressed in the Declaration of Sheila Carter.[54]  As explained in § III.B.2(b)(1), above, the court has already concluded that plaintiff's own account of the May 16th altercation with Ms. Carter as presented in both her declaration and her deposition demonstrates that on that day plaintiff served as Charge Nurse, and that plaintiff and Ms. Carter engaged in an altercation over which of them should have responded to a patient call light.  Plaintiff has failed to present any evidence from which a reasonable factfinder could conclude that McLaughlin did not reasonably believe that the altercation that occurred on May 16th evidenced plaintiff's "failure to properly supervise and assist fellow nurses with patient care on May 16, 2009," and her

---

[53]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[54]See Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, pp. 7-8 ¶¶ 26-28; Exhibit 20 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

"inability to get along with co-workers."[55]  See Waggoner, 987 F.2d at 1165.

The third of the three examples of plaintiff's "continuing poor job performance" is that plaintiff was "argumentative and insubordinate with Nurse Manager regarding patient assignments on February 27 and May 22, 2009."[56]  HCHD supports the first of these two examples of poor job performance by citing a February 18, 2009, memo from Anglin to McLaughlin stating that at 10:00 a.m. on February 17, 2009, she had received a call from the plaintiff asking for help because the unit was expecting to receive a new patient.[57]  In a written memo about this incident that Anglin provided to McLaughlin on February 18, 2009, Anglin stated that when she responded to plaintiff's call for help, plaintiff told Anglin that she felt accepting a new patient would place her license in jeopardy, but plaintiff's coworker, Teri Moreaux, told Anglin that the unit could handle the new patient.[58]

HCHD supports the second of these examples of poor job performance by citing a May 29, 2009, Memo from Anglin to

---

[55]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[56]Id.

[57]See Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, ¶ 29 acknowledging that the reference to February 27th on her Termination Counseling Form was a typographical error for the date actually at issue: February 17, 2009.

[58]Feb. 18, 2009, Memo from Anglin to McLaughlin, Exhibit 25 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

McLaughlin,[59] and a May 27, 2009, written statement signed by Orlesia Jones, RN BSN.[60] Anglin states in her memo to McLaughlin that on Friday, May 22nd, at approximately 1315, Ms. Jones let her know that a new patient was arriving and that plaintiff wanted Jones to admit the new patient even though Jones already had six patients while plaintiff had only five patients. When Anglin directed plaintiff to admit and care for the new patient, plaintiff became upset and complained that Anglin was being unfair to her.[61] In her written statement, Jones wrote that on Friday, May 22nd, she and plaintiff started out with six patients each, that at 1208 one of plaintiff's patient's was discharged, and that when later that afternoon they learned a new patient would be admitted, plaintiff told Jones that she expected Jones to admit and care for the new patient, meaning that Jones would have seven patients while plaintiff would have only five patients. Jones states that she sought assistance from Anglin who after arguing with plaintiff directed plaintiff to admit and care for the new patient.[62]

Without disputing that on February 17th she argued with her supervisor, Anglin, about admitting a new patient, and that on

---

[59]May 29, 2009, Memo from Anglin to McLaughlin, Exhibit 23 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[60]May 27, 2009, letter from Orlesia Jones to McLaughlin, Exhibit 24 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[61]Id.

[62]May 27, 2009, Statement by Orlesia Jones, Exhibit 24 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

May 22nd she argued about admitting a new patient first with her coworker, Jones, and then with her supervisor, Anglin, plaintiff contends that the defendant should not have considered these incidents when deciding to discharge her because she was not disciplined for either of them.   Plaintiff asserts that

> my supervisor did not write me up for either incident. I was not given a written warning or placed on any type of probation.     Yet, these instances of my "insubordination" were used to terminate me from my over twenty years of employment with the County.   I had not been written up for insubordination since 2007.   Yet, HCHD now claims this is a pattern and practice with me and is one of the reasons that HCHD lost confidence in my ability to perform my job.[63]

In other words, without disputing that her conduct on February 17th and May 22nd exhibited insubordination and an inability to get along with her coworkers, plaintiff merely argues that the arguments she had with her supervisor and her coworker, Jones, on these dates, which were referenced on the May 29, 2009, Employee Counseling Form as examples of "continuing poor job performance," were not severe enough to warrant disciplinary action.

Because plaintiff does not dispute that she did, in fact, engage in the conduct that the defendant cites as examples of her "continuing poor job performance," but simply argues that her conduct was either justified or not severe enough to warrant disciplinary action, plaintiff has failed to present evidence from

---

[63]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, pp. 8-9 ¶ 29.

which a reasonable factfinder could conclude that the defendant's stated reasons for her discharge were not true or worthy of credence but, instead, pretexts for discrimination.

(ii)  No Fact Issue as to Cat's Paw Theory

The only evidence of national origin discrimination that plaintiff offers are the 2006 statements that she overheard Anglin make regarding Anglin's distrust of Nigerians and intention to get rid of Nigerians.  Defendant has presented uncontested evidence, however, that the person responsible for discharging plaintiff was McLaughlin, not Anglin.  Plaintiff argues that Anglin's discriminatory statements about Nigerians are, nevertheless, sufficient to raise a fact issue for trial because Anglin influenced McLaughlin's decision to discharge her.  In support of this argument plaintiff cites Staub v. Proctor Hospital, 131 S.Ct. 1186 (2011), Long v. Eastfield College, 88 F.3d 300 (5th Cir. 1996), and Rios v. Rossotti, 252 F.3d 375 (5th Cir. 2001), for recognition of the "Cat's Paw Theory of Liability."  Plaintiff explains that the "Cat's Paw Theory of Liability" allows courts to impute discriminatory animus of non-decision makers to decision makers when the non-decision makers "had influence or leverage over the official decision maker."[64]  Plaintiff explains that in Rios the Fifth Circuit considered

---

[64]Plaintiff's Response, Docket Entry No. 58, p. 21.

whether evaluations given by subordinates to a decisionmaker could enter into the determination of discrimination. The court referred to its "rubber stamp" analysis, noting that "statements of non decision makers become relevant, however, when the ultimate decision maker's action is merely a "rubber stamp." Quoting Russell, the court stated that "[i]f the employee can demonstrate that others had influence or leverage over the official decisionmaker . . . it is propr to impute their discriminatory attitudes to the formal decisionmaker." Id. The court provided some guidance on when this analysis may apply noting that "[w]here an evaluation is the sole basis or comprises a substantial basis on which the decision maker acts, the evaluation may often constitute sufficient influence to fall under the "rubber stamp" exception. Id.

Finally, the United States Supreme Court has settled the issue of what constitutes a motivating factor under the Cat's Paw Theory of Liability when a supervisor is the bad actor. In Staub v. Procter Hospital, 131 S.Ct. 1186 (2011)[,] the Court held that "the requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. Id. . . . The court continued, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . ." Id.

That is precisely the situation here, since it is clear that Jimmie Anglin influenced the decision to terminate Plaintiff. As the evidence demonstrates, to the extent that Ms. McLaughlin was the true decision maker, she only made that determination after speaking to Jimmie Anglin and reviewing the reprimands and write-ups that Ms. Anglin prepared against Ms. Ihegword. Ms. Anglin is also the person who claims to have observed some of Plaintiff's "performance issues" and is also the person who provided upper management with a summary of the allegations against Plaintiff. McLaughlin Depo., pp. 67-69, 79-83, 87-94. In fact, Ms. McLaughlin confirmed that she relied heavily on Ms. Anglin's observations and the information provided to her by Ms. Anglin. McLaughlin Depo., pp. 83-93, 114-123, 138-140. As Ms. Ihegword previously stated, the majority of those reprimands were fictitious. And, while Ms. Ihegword admits that she was tardy on occasion in

2007 due to her ongoing health issues, Ms. Ihegword's African-American coworkers were not written up even though they too were sometimes tardy. Therefore, there can be no question that Ms. Ihegword's termination sprang from Ms. Anglin's ongoing manipulations.

Finally, Ms. Anglin is the individual who requested that Plaintiff be terminated. Therefore, it is undisputed that the decision was influenced by Ms. Anglin, who had previously expressed a discriminatory animus against persons of Nigerian descent and who had expressed a negative attitude toward accommodating Plaintiff's disability.[65]

The court concludes that plaintiff has failed to raise a fact issue on the Cat's Paw Theory of Liability because even assuming that Anglin made the discriminatory statements attributed to her in 2006, plaintiff has failed to present any evidence showing that McLaughlin rubber stamped Anglin's decision to discharge her, or that Anglin took any action that proximately caused her discharge.

Plaintiff asserts that Anglin "is the individual who requested that Plaintiff be terminated,"[66] but plaintiff fails to cite any evidence in support of this assertion. Plaintiff asserts that McLaughlin relied heavily on Anglin's observations and on information provided to her by Anglin in making her decision to discharge the plaintiff, but the excerpts from McLaughlin's deposition on which plaintiff relies do not support this assertion.[67] Anglin testified that she did not recommend that

---

[65]Id. at 22-23.

[66]Id. at 23.

[67]Id. (citing pages 83-93, 114-123, 138-140 of McLaughlin's deposition, Exhibit 3 to Defendant's Motion for Summary Judgment,
(continued...)

plaintiff be discharged, that no one asked for her opinion on whether to discharge plaintiff, and that given plaintiff's history she did not believe that plaintiff would ever be discharged.[68] Plaintiff has not cited any evidence that contradicts Anglin's testimony on this issue. Moreover, although McLaughlin did review all of plaintiff's performance history before deciding to discharge her, and some of the historical materials that McLaughlin reviewed were prepared by Anglin, plaintiff has failed to present any evidence capable of establishing that an Employee Counseling Form, memo, or other evaluation prepared by Anglin served as the sole basis or even a substantial basis on which McLaughlin decided to discharge her.

As evidence that her discharge "sprang from Ms. Anglin's ongoing manipulations,"[69] plaintiff cites excerpts from McLaughlin's

---

[67](...continued)
Docket Entry No. 46).  The court has reviewed all of the pages of McLaughlin's deposition cited by the plaintiff and has not found evidence that McLaughlin relied heavily on Anglin's observations and the information provided to her by Anglin in making her decision to discharge the plaintiff.  Pages 83-93 address the long lunch breaks for which Anglin placed plaintiff on 90-day probation; pages 114-123 address the altercation between plaintiff and Carter on May 16, 2009, which McLaughlin testified she discussed with both plaintiff and Carter, see pp. 116:8-10 and 121:18-24; pages 138-140 address the fact that McLaughlin did not discuss her loss of confidence with the plaintiff prior to the day of her discharge.

[68]Anglin Deposition, Exhibit 2 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 156:7-9, 157:21-22 and 183:15-24.

[69]Plaintiff's Response, Docket Entry No. 58, p. 23.

deposition that do not support plaintiff's contention that Anglin's actions proximately caused her discharge.   Instead, McLaughlin's deposition testimony undisputedly establishes that she initiated her own investigation of plaintiff's performance history following the grievance hearing at which plaintiff argued she should not have been disciplined for taking lunch breaks that were more than 30 minutes long because on at least one occasion her lunch break had been interrupted by the need to educate a patient on the use of a feeding tube.[70] McLaughlin testified that plaintiff claimed to have been engaged in patient education on March 16, 2009, that in an effort to verify this claim she checked the patient records for March 16, 2009, and found that the only patient in plaintiff's unit with a feeding tube that day was not plaintiff's patient and had not received education from plaintiff.   McLaughlin testified that although Anglin provided her the patient records,[71] "Anglin didn't tell me that it wasn't documented.   She brought me the actual documents from the patient.   So the chart documents from my review. So I didn't do it on the word of Ms. Anglin, per se."[72]   McLaughlin testified that the lack of documentation supporting plaintiff's claim that her lunch break had been interrupted on March 16, 2009,

---

[70]McLaughlin Deposition, Exhibit 3 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, pp. 84:5-87:14.

[71]Id. at 91:18-24.

[72]Id. at 96:16-19.

by a period of patient education raised a flag that caused her to investigate plaintiff's entire performance history.[73]

McLaughlin testified that she also investigated the altercation that plaintiff had with Carter regarding who should have answered a patient call light on May 16, 2009. McLaughlin testified that both plaintiff and Carter acknowledged that they had an altercation that day,[74] that McLaughlin spoke to both plaintiff and Carter about the altercation,[75] and that McLaughlin asked both plaintiff and Carter to provide written statements about the altercation.[76]   McLaughlin testified that after conducting her investigation she concluded that plaintiff had "a history of having altercations or verbal . . . battles with other staff,"[77] and cited as an additional example of altercations plaintiff had with coworkers the altercation that plaintiff had with Jones on May 22, 2009, about who should admit a new patient.[78]

McLaughlin testified that her investigation of plaintiff's performance history caused her to lose confidence in the plaintiff.

> After looking at all of the information over the more recent events and past events, as I stated to you what

---

[73]Id. at 95:17-96:22, 100:20-21.

[74]Id. at 115:10-13.

[75]Id. at 116:7-18, 121:18-122:17.

[76]Id. at 122:21-123:13.

[77]Id. at 125:19-21.

[78]Id. at 126:21, 133:10-15.

-40-

was particularly onerous to me was -- well, it was
onerous to me that there was a verbal altercation between
her and Ms. Carter.

But what was particularly troubling to me and
unprofessional to me was her unresponsiveness to the
patient's needs. And by not turning around and getting
up and going and answering that call light, to me, it was
almost like the final evidence that it wasn't in the
forefront of her thinking in her care for patients; that
the documentation or the writing, which is what she was
doing at the time, had more prevalence and -- for her at
the time than the patient's needs did. And that's not
the practice that we want to demonstrate at Quentin
Mease.

The other thing is, as I've tried to say to you, is
that over time, she hasn't taken responsibility for her
own behavioral changes even when they need to happen;
that similar occurrences have happened throughout her
career at the district.

And my sense is -- and whenever she is brought up to
have a conversation about her performance or her
behavior, it -- for her, it becomes somebody else is
doing this, somebody else is doing that. But it's not
about, yeah, I -- you know, maybe it seems that way, how
can we work on it, how can we change it, how can we be
better, how can we have better teamwork.

And so when we talk about loss of confidence, it's
the conglomerate of I don't feel like I can depend on you
as a worker at the district to take care of these
patients. . . . This is not about her skills as a nurse,
her ability to start an IV or pass medications. This has
to do with her whole behavior around patient care. And
the unit that she works on is a team environment . . .

. . . [W]hen you are frequently being talked with
about how you talk to people, about how you make
decisions, about how you make assignments based on
numbers versus on -- you know, being realistic in a
situation that needs accommodation for that day.

. . .

. . . Ms. Ihegword, the gestalt of her behavior is
she is not a team player. She doesn't see that she needs
to improve her behavior. She doesn't see -- I don't see
that she sees taking care of her patient, taking care of

the patient versus the paperwork as her primary goal. And that's why I have loss of confidence in her ability to truly care for our patients.[79]

McLaughlin's description of the investigation that she undertook shows that following the grievance in which plaintiff challenged the 90-day probation she received for continuing her lunch breaks even after she had clocked back into work, McLaughlin reviewed patient records for March 16, 2009, the day plaintiff claimed her lunch break had been interrupted by the need to educate a patient on the use of a feeding tube, and that when she found that the patient records from that day did not support plaintiff's claim, McLaughlin reviewed plaintiff's entire performance history. Because Anglin was plaintiff's immediate supervisor, Anglin authored the Employee Counseling Form pursuant to which plaintiff was placed on 90-day probation. Plaintiff contends that the 90-day probation was unjustified, but the comments that she wrote on the Employee Counseling Form show that she did not contest that she had, in fact, been observed taking lunch breaks that were more than 30 minutes long, only that other employees who were Anglin's friends were not similarly disciplined.[80]  Plaintiff has not pointed

---

[79]Id. at 135:24-138:14

[80]Employee Counseling Form, Exhibit 18 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, where plaintiff wrote: "This all has come up due to retaliation of my complaint that Nurse Manager is showing favoritism to her friends — lots of staff leave off unit to buy food or smoke, etc.  I have not seen it being addressed.  I need to put a Grievance complaint and would like if [an] outside investigator can come to unit."

-42-

to any counseling form prepared by Anglin that recommended her discharge, and has not presented any evidence contradicting McLaughlin's testimony that counseling forms and/or other materials prepared by Anglin were only one of several categories of evidence that she reviewed in making her decision to discharge the plaintiff. For example, McLaughlin testified that she not only reviewed plaintiff's disciplinary record, but she also talked to plaintiff and talked to Carter about the altercation that she and plaintiff had on May 16, 2009. Because plaintiff has failed to present evidence from which a reasonable trier of fact could conclude that McLaughlin rubber stamped Anglin's decision to discharge her, or that Anglin's actions proximately caused McLaughlin to discharge her, plaintiff's reliance on the Cat's Paw Theory of Liability is misplaced because the evidence that plaintiff has presented in support of that theory of liability is not sufficient to raise a genuine issue of material fact for trial on plaintiff's national origin discrimination claim.

## D.   Plaintiff's Retaliation Claim Fails

Plaintiff argues that "she was terminated because of her disability, her request for accommodation, and because of her complaints to upper management and Human Resources when Ms. Anglin failed to address her accommodation request."[81]  In support of this argument, plaintiff asserts that

---

[81]Plaintiff's Response, Docket Entry No. 58, p. 19.

[s]hortly after [she] requested an accommodation for her osteoarthritis, HCHD began targeting [her] for termination. For example, [plaintiff] was written up for minor infractions, including numerous write-ups for being tardy or having unscheduled absences from work. Defendant's Exhibit 11; Defendant's Exhibit 14; Defendant's Exhibit 15. Moreover, Plaintiff was reprimanded for incidents that other non-Nigerian employees were not reprimanded. Exhibit 1. In addition, Plaintiff was the only employee in the unit who had requested an accommodation for a disability. Exhibit 1.

It became quite clear that Ms. Anglin was targeting the Plaintiff. For example, Ms. Anglin also reprimanded [plaintiff] for having an altercation with a coworker, and even suspended her while the investigation regarding the altercation took place. Exhibit 1; Defendant's Exhibit 12; Defendant's Exhibit 13. Harris County eventually lifted the suspension and paid [plaintiff] her back pay since the evidence indicated that she was not at fault in the altercation.[82]

Defendant does not dispute that plaintiff engaged in a protected activity by requesting a reasonable accommodation but argues that plaintiff has failed to establish a prima facie case of retaliation because she cannot establish that there exists a causal connection between her protected activity and an adverse employment action.

1.   Applicable Law

The ADA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint . . . under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). Courts analyze ADA retaliation claims under the burden-shifting framework of McDonnell Douglas, 93 S.Ct. at 1817. See Turner v. Baylor Richardson Medical Center, 476

_____

[82] Id. at 7-8.   See also id. at 20.

-44-

F.3d 337, 348 (5th Cir. 2007).  Under that framework the employee must first establish a _prima facie_ case of retaliation.  _Id._  If the employee succeeds, the employer must offer a legitimate, non-retaliatory reason for the adverse employment action.  _Id._  The burden then shifts back to the employee to show that genuine issues of material fact exist regarding whether the employer's proffered reason is unworthy of credence.  _Id._  To establish a _prima facie_ case of retaliation, plaintiff must show (1) that she engaged in a statutorily-protected activity, (2) that she experienced a materially adverse injury, and (3) that a causal link exists between the protected activity and the injury.  _Id._

    2.   _Application of the Law to the Facts_

Plaintiff argues that a causal connection exists between her protected activity and the adverse action of discharge because soon after she requested a reasonable accommodation she was written up for minor infractions, and in 2009 she was discharged.[83]  In support of this argument plaintiff contends that she received the following write-ups or employee reprimands in retaliation for having requested a reasonable accommodation:  (1) on February 16, 2007, counseling for frequent tardiness and a warning that failure to improve could result in a three-day suspension;[84] (2) on August 9,

---

[83]_Id._ at 7 and 20.

[84]Employee Counseling Form, Exhibit 11 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

2007, counseling for unprofessional conduct and rudeness to a coworker, Delta Scott, suspension pending the outcome of the ensuing investigation, and a warning that failure to improve could result in termination;[85] (3) on August 16, 2007, a counseling and 90-day probation for the altercation that she had with Delta Scott;[86] (4) on October 10, 2007, a verbal counseling for five unscheduled absences;[87] and (5) on November 29, 2007, a written warning for two unscheduled absences.[88]

The write-ups and reprimands that plaintiff cites in support of her contention that she was discharged in retaliation for having requested a reasonable accommodation are not sufficient to establish the third prong of her prima facie case, i.e., that there exists a causal connection between her protected activity and the adverse employment action that she suffered.  Undisputed evidence establishes that plaintiff initially sought a modified work schedule as a reasonable accommodation in the fall of 2007 and that she received the reasonable accommodation that she requested before she provided HCHD a doctor's note substantiating her request.

---

[85]Employee Counseling Form, Exhibit 12 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[86]Employee Counseling Form, Exhibit 13 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[87]Employee Counseling Form, Exhibit 14 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[88]Employee Counseling Form, Exhibit 15 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

Moreover, plaintiff was not discharged until May 29, 2009, approximately 17 months after she received her reasonable accommodation.[89] Because the first three of the five counselings that plaintiff contends she received as part of a deliberate effort to discharge her occurred months before she ever requested a reasonable accommodation, they could not have been issued in retaliation for having requested a reasonable accommodation. Moreover, when plaintiff received the two counselings for unscheduled absences on October 10 and November 29, 2007, which were at least arguably after she had requested a reasonable accommodation, plaintiff she did not dispute that she had, in fact, engaged in the conduct for which she was disciplined. For example, on the Employee Counseling Form that she received on October 10, 2007, plaintiff protested in writing that the absences were not intentional but, instead, caused by flare up of her knee problems, which required her to stay off of her feet.[90]

Because plaintiff does not dispute that she engaged in the conduct for which she was disciplined, and because plaintiff did not protest on the Employee Counseling Forms that the discipline she contends she received in retaliation for having engaged in protected conduct was not issued in retaliation for having

---

[89]Termination Counseling Form, Exhibit 19 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

[90]Employee Counseling Form, Exhibit 14 to Defendant's Motion for Summary Judgment, Docket Entry No. 46.

requested a reasonable accommodation, plaintiff has failed to present evidence establishing the third prong of her prima facie case of ADA retaliation, i.e., that there exists a causal connection between her protected conduct of requesting a reasonable accommodation and the adverse employment action of her discharge 17 months later. Moreover, the 17 months between plaintiff's receipt of her reasonable accommodation and her discharge is too distant to create an inference of causation. See Raggs v. Mississippi Power & Light Co., 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month lapse, by itself, does not support an inference of a casual link). In addition, for the reasons stated in § III.B.2(b)(2), above, the court concludes that a rational juror could not conclude that defendant's proffered reasons for terminating plaintiff were not true but, instead, pretexts for retaliation for having requested a reasonable accommodation for her osteoarthritis.

**E.    Plaintiff's Claims for Unpaid Overtime Fail**

Plaintiff has asserted claims for unpaid overtime under both the FLSA and Chapter 61 of the Texas Labor Code. Defendant argues that it is entitled to summary judgment on both of these claims.

### 1.    Plaintiff's FLSA Claim Fails

Plaintiff seeks unpaid overtime wages under the FLSA by alleging that defendant required her to work beyond the end of each shift by clocking out and continuing to work "an average of four

(4) hours off the clock."[91]  Defendant argues that it is entitled
to summary judgment on plaintiff's FLSA claim for unpaid overtime
wages because plaintiff cannot present any evidence capable of
establishing that she performed work for which she was not paid, or
that HCHD knew she performed worked for which she was not paid.

       (a)   Applicable Law

Plaintiff seeks to hold defendant liable for violation of the
overtime provision of the FLSA, 29 U.S.C. § 207(a)(1).   This
provision requires employers to pay one-and-one-half times the
employee's regular rate for all hours worked in excess of forty
hours per week.  Id.  In order to prevail on her claim for unpaid
overtime plaintiff must prove by a preponderance of the evidence:
(1) the existence of an employment relationship; (2) that she was
engaged in commerce or employed by an enterprise engaged in
commerce; (3) that defendants failed to pay her overtime required
by the FLSA; and (4) that she is owed the amount claimed by a just
and reasonable inference.  Id.  See also Harvill v. Westward
Communications, L.L.C., 433 F.3d 428, 440-41 (5th Cir. 2005).  An
employee is "employed" for purposes of the FLSA during alleged
overtime hours if an employer has actual or constructive knowledge
that the employee was working.  Newton v. City of Henderson, 47
F.3d 746, 748 (5th Cir. 1995) (citing Davis v. Food Lion, 792 F.2d

---

    [91]Plaintiffs' Original Complaint, Docket Entry No. 1, p. 5
¶ 30.

1274, 1276 (4th Cir. 1986)). <u>See also</u> 29 U.S.C. § 203 (defining "employ" to include "to suffer or permit to work"); <u>Harvill</u>, 433 F.3d at 441. "'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation.'" <u>Id.</u> (quoting <u>Forrester v. Roth's I.G.A. Foodliner, Inc.</u>, 646 F.2d 413, 414 (9th Cir. 1981)). <u>See also</u> 29 C.F.R. § 785.13 ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them."). An employee cannot, however, perform overtime work without the employer's knowledge or contrary to the employer's directions and then assert a right to be paid.  If "the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." <u>Harvill</u>, 433 F.3d at 441 (citing <u>Newton</u>, 47 F.3d at 748).

An employee bringing an FLSA action for unpaid overtime must first demonstrate that she has performed work for which she alleges she was not compensated.  <u>Harvill</u>, 433 F.3d at 441.  An employee meets this burden by showing that she "in fact performed work" for which she did not receive overtime compensation and by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." <u>Id.</u> (quoting <u>Anderson v. Mount Clemens Pottery Co.</u>, 66 S.Ct. 1187, 1191-92 (1946),

superseded by statute as stated in IBP, Inc. v. Alvarez, 126 S.Ct. 514, 516 (2005)).  If an employee satisfies her burden of showing that she "in fact performed work" for which she did not receive overtime compensation, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  Id.  "If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate."  Id. An employee, however, "would not be estopped from claiming additional overtime if '[t]he court found that the employer knew or had reason to believe that the reported information was inaccurate.'"  Newton, 47 F.3d at 749 (quoting Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972)).

     (b)  Application of the Law to the Facts

### (1)  Plaintiff Lacks Evidence HCHD Knew She Worked Overtime Hours for which She Was Not Paid

Defendant argues that plaintiff's FLSA claim for unpaid overtime fails because plaintiff is unable to cite evidence capable of showing that HCHD knew she worked overtime hours for which she was not paid.  In support of this argument the defendant cites deposition testimony of Anglin stating that she was plaintiff's supervisor and that she stressed to all of her employees -- including plaintiff -- the importance of time management, finishing their work by the end of their shift, and working any overtime

needed to complete their duties on the clock.[92]   Anglin also
testified that she typically worked an eight-hour shift so that she
typically left work before plaintiff's twelve-hour, day shift
ended.[93]  Defendant cites its policy that required employees to keep
track of their time by badging in and out of an electronic badge
reading system, and its records of the plaintiff's time card
reports between December 24, 2007, and her discharge on May 29,
2009, as evidence that plaintiff "worked past her scheduled shift
*on the clock*, ranging from a few minutes to almost two hours."[94]
Defendant cites the declaration of plaintiff's coworker, Sheila
Carter, who worked with plaintiff on the day shift, and who stated
that she and the plaintiff did not work past their normal shifts
every workday, and that when they did work past their normal shifts
they did so on — not off — the clock.[95]  Defendant also cites the
declaration of Francisca Obi, who worked on the night shift, and
who stated that plaintiff only "occasionally" stayed past her
scheduled shift into Obi's shift.[96]   In light of this evidence

---

[92]*Id.* at 33-34 (citing Exhibit 2 thereto, Anglin Deposition,
pp. 167:22-173:1).

[93]*Id.* at 33 (citing Exhibit 2 thereto, Anglin Deposition,
p. 167:8-13).

[94]Defendant's Motion for Summary Judgment, Docket Entry No. 46,
p. 32 (citing Exhibit 31 thereto, Plaintiff's Time Card Reports).

[95]*Id.* at 31-32 (citing Exhibit 20 thereto, Declaration of
Sheila Carter, ¶¶ 3, 10-11).

[96]*Id.* at 32-33 (citing Exhibit 27 thereto, Declaration of
Francisca Obi, ¶ 4 ("In around 2007, the GPCU switched from three
(continued...)

defendant argues that plaintiff cannot raise a genuine issue of material fact that it knew she worked overtime hours for which she was not being paid.

Plaintiff responds that HCHD knew she worked overtime hours for which she was not paid because Anglin instructed her and the other nurses to work off the clock when they had work to finish at the end of their shifts.  Plaintiff supports this response with her own declaration in which she states:

> 30.   During my employment, I often worked overtime, in excess of 40 hours during a seven-day workweek.
>
> 31.   While I would sometimes properly log my overtime hours, using our clock in and out system, my supervisor, Jimmie Anglin, made clear to me and to my coworkers that we would also have to work "off the clock."
>
> 32.   I did receive some overtime compensation from HCHD, because Ms. Anglin did allow us to log certain types of overtime work, such as certain meetings and training.
>
> 33.   Moreover, if I was going to incur less than an hour's overtime, Ms. Anglin did not always instruct us to clock out.  However, if I was going to need to stay for a longer period of time, I was instructed to clock out and then complete my work.[97]

Asserting that plaintiff's "declaration in support of her Response is directly contradicted by her previous sworn deposition

---

[96](...continued)
shifts to two twelve hours shifts — a day and a night shift. Ihegword worked the day shift and I worked the night shift. Occasionally, Ihegword would stay past her scheduled shift into my shift, but she did not do this every day she worked.").

[97]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response, Docket Entry No. 58, p. 9 ¶¶ 30-33.

testimony,"[98] defendant argues that the above-quoted excerpts from "the [plaintiff's] declaration cannot create a genuine fact issue regarding [her] claims against HCHD."[99] Defendant argues that these excerpts from plaintiff's declaration are not sufficient to defeat summary judgment because they are either conclusory or contradict her deposition testimony that Anglin directed her and the other nurses to clock out at the end of their shifts regardless of whether their work was finished or not:

> Q.  So you're saying you weren't paid for the time that you spent working after your shift, after that 12 hours?
>
> A.  Yes.  Because we -- Ms. Anglin told us you cannot stay on our time.  Regardless whether you finish or not, you have to clock out and then go back and then finish what you have to do.  So those hours I wasn't paid.
>
> Q.  So you're saying that Ms. Anglin would tell the nurses that she supervised, no matter what, clock out after the end of their shift, and then if they still had work to do, go back and finish it off the clock?
>
> A.  Yes.[100]

The allegations that plaintiff has made in her Original Complaint and in her deposition that defendant required her to work

---

[98]Defendant's Motion to Strike and Objections to Plaintiff's Declaration in Response to Defendant's Motion for Summary Judgment ("Defendant's Motion to Strike"), Docket Entry No. 60, p. 3.

[99]Id.

[100]Id. at 8 (citing Plaintiff's Deposition, Exhibit 1 to Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 58:4-17).  See also id. at 14 (asserting that ¶ 30 is conclusory).

hours of uncompensated overtime beyond the end of each shift by clocking out and continuing to work "off the clock"[101] are soundly refuted by HCHD's records of plaintiff's time card reports between December 24, 2007, and her discharge on May 29, 2009, which show that plaintiff "worked past her scheduled shift *on the clock*, ranging from a few minutes to almost two hours."[102]  Plaintiff's attempt to raise a genuine issue of material fact for trial by submitting a declaration in which she attempts to explain that although she was, in fact, paid for some overtime hours, she was not paid for all the overtime hours that she worked because her declaration contradicts without explanation her sworn deposition testimony.  See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."). See also Cleveland v. Policy Management Systems Corp., 119 S.Ct. 1597, 1603-04 (1999) (recognizing that [f]ederal courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting . . . her own previous sworn testimony (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or

---

[101]Id.

[102]Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 32 (citing Exhibit 31 thereto, Plaintiff's Time Card Reports).

attempting to resolve the disparity").[103]  The declaration attached
to plaintiff's response in opposition to defendant's motion for
summary judgment is not sufficient to raise a genuine issue of
material fact for trial regarding whether plaintiff worked overtime
hours for which she was not paid and/or whether HCHD knew that she
worked overtime hours for which she was not paid because
plaintiff's declarations that she "would sometimes properly log
[her] overtime hours, using HCHD's clock in and out system,"[104] that
she "did receive some overtime compensation from HCHD,"[105] and that
"if [she] was going to incur less than an hour's overtime,
Ms. Anglin did not always instruct [her] to clock out.  However, if
[she] was going to need to stay for a longer period of time, [she]
was instructed to clock out and then complete [her] work,"[106]
contradicts without explanation her deposition testimony that
"Ms. Anglin told us you cannot stay on our time.  Regardless
whether you finish or not, you have to clock out and then go back
and then finish what you have to do.  So those hours I wasn't
paid."[107]

---

[103]Defendant's Motion to Strike, Docket Entry No. 60, p. 3
(quoting Cleveland v. Policy Management Systems Corp., 119 S.Ct.
1597, 1603-04 (1999) (citing inter alia Albertson v. T.J.
Stevenson & Co., 921 F.2d 223, 228 (5th Cir. 1984))).

[104]Plaintiff's Declaration, Exhibit 1 to Plaintiff's Response,
Docket Entry No. 58, ¶ 31.

[105]Id. ¶ 32.

[106]Id. ¶ 33.

[107]Plaintiff's Deposition, Exhibit 1 to Defendant's Motion for
Summary Judgment, Docket Entry No. 46, p. 58:7-11.

Undisputed evidence establishes that HCHD policy required employees to track the time they work via an electronic badge system, that plaintiff participated in this electronic system and received pay for overtime hours that she worked "on the clock," and that plaintiff's supervisor, Anglin, who normally left the hospital before plaintiff's shift ended, had no reason to believe that if plaintiff worked overtime hours plaintiff would not be paid for those hours.  Although plaintiff asserts that there was a staffing shortage on her unit and that she often served as Charge Nurse, plaintiff has failed to present evidence from which a reasonable factfinder could conclude either the staffing shortage in her unit or the extra duties that she was responsible for performing as Charge Nurse created a workload that either reasonably caused her to work overtime or provided constructive knowledge to Anglin and/or anyone else at HCHD that she was working overtime hours for which she was not being compensated.  Moreover, plaintiff fails to present any evidence that she ever advised Anglin or anyone else at HCHD that the staffing shortage or duties required of the Charge Nurse required her to work overtime.  In light of the undisputed evidence on which the defendant relies, plaintiff's unsubstantiated assertions that she worked overtime hours for which she was not paid fail to raise a genuine issue of material fact that HCHD suffered or permitted her to work overtime hours for which she was not paid.

## (2)   Plaintiff Lacks Evidence of Hours Worked

Defendant argues that plaintiff's FLSA claim for unpaid overtime fails because plaintiff "has no idea how many hours she allegedly worked off the clock."[108]   In support of this argument defendant relies on excerpts from plaintiff's deposition testimony. Defendant argues that

> Ihegword alleges in her Complaint that HCHD required her to work off the clock at the end of *each* shift by clocking out and continuing to work "an average of four (4) hours off the clock." (Pl.'s Compl. ¶ 30.)  In her deposition, when asked how often she worked overtime each week, Ihegword responded, "I know I will say like *maybe* — all together *maybe* 50 hours a month." (Ex. 1, Ihegword Dep. 179:2-180:7) (emphasis added.)  Then, when asked whether this amorphous "50 hours" equated to roughly 12 hours per workweek, Ihegword said, "I believe so." (*Id.* at 180:10-14.)  Further, when asked whether the alleged 12 hours per workweek equated to four hours per workday (given that Ihegword's work schedule was three days per workweek), Ihegword stated, "It's not every single day, but basically so." (*Id.* at 180:15-18; *see also* Ex. 6, Final Agreed Schedule.).[109]

Defendant also argues that even if, as she alleges, plaintiff worked an average of four hours beyond each of her scheduled twelve-hour shifts, because plaintiff admits that she was paid for some of the hours that she worked beyond her shift, plaintiff would still not be able to show the number of hours that she worked beyond her shift for which she was not paid.[110]

---

[108]Defendant's Motion for Summary Judgment, Docket Entry No. 46, p. 31.

[109]<u>Id.</u> at 30-31.

[110]<u>Id.</u> at 31 n.38.

Plaintiff responds that "to the best of her memory [she] worked approximately twelve hours of overtime each week."[111] Plaintiff argues that

> [m]ost of that overtime would be off the clock, but some of the overtime would have been paid to her since [she] was able to clock some of her overtime. All the nurses on her unit worked twelve-hour shifts. Therefore, [plaintiff] worked three twelve-hour shifts each week. Based on [plaintiff's] recollection, [plaintiff] worked approximately 4 hours of overtime most days. This equates to roughly twelve hours of overtime per week. Therefore, looking at the pay [plaintiff] actually received, and adding the additional off the clock overtime hours, one can easily calculate her actual overtime pay.[112]

Also, in her response plaintiff contends for the first time that she lacks documentary evidence of the number of hours of unpaid overtime that she worked because when she was discharged she was not allowed to retrieve her personal belongings -- including the log that she maintained of the number of hours she worked compared to the number of hours for which she was paid -- from her hospital locker.[113]

Defendant replies that

> . . . while Ihegword claims in her declaration that she worked approximately 12 hours of overtime each week, she admits that some of this time was on the clock (for which HCHD paid her) and some was off the clock. (Ex. 1 to Ihegword's Resp., Ihegword Decl. ¶ 37.) Ihegword also states that while the 12 hours of overtime would equate to 4 hours *each* work day (as she worked 3 days per week), she did not *always* work overtime each work day. (*Id.*)

---

[111]Plaintiff's Response, Docket Entry No. 58, p. 26.

[112]Id. at 26.

[113]Id. at 25.

Ihegword, therefore, still cannot provide a number solely
for the hours that she allegedly worked off the clock.
Thus, Ihegword fails to produce sufficient evidence to
show the amount of her off the clock work as a matter of
just and reasonable inference.[114]

Plaintiff's testimony that "to the best of her memory" she
worked twelve hours of unpaid overtime per week is not sufficient
to raise a genuine issue of material fact for trial because HCHD
maintained records of the hours that plaintiff worked in each pay
period, and plaintiff's unsubstantiated assertion that "to the best
of her memory" she worked an average of twelve hours per week of
overtime were insufficient to raise a reasonable inference of the
amount of overtime that she worked.  The excerpts from plaintiff's
deposition cited by defendant show that plaintiff's estimate of the
uncompensated overtime she worked is not only unsubstantiated but
also speculative, and an unsubstantiated and speculative estimate
of uncompensated overtime does not constitute evidence sufficient
to show the amount and extent of that work as a matter of just and
reasonable inference.  See Harvill, 433 F.3d at 441.  Because
plaintiff has not submitted any evidence other than her own
unsubstantiated assertions that she worked an estimated twelve
hours of unpaid overtime per week, plaintiff has failed to raise a
genuine issue of material fact for trial.

    2.  Plaintiff's Chapter 61 Claim Fails

Defendant argues that plaintiff's claim for unpaid overtime
wages asserted pursuant to Chapter 61 of the Texas Labor Code

---

[114]Defendant's Reply, Docket Entry No. 59, pp. 17-18.

("TLC") fails because Chapter 61 does not afford plaintiff a private cause of action.   Plaintiff has not responded to this argument.

Chapter 61 of the TLC, part of the Texas Payday Law, governs an employer's obligation to pay wages to employees. See Tex. Lab. Code Ann. §§ 61.011-.020; Igal v. Brightstar Info. Tech. Group, 250 S.W.3d 78, 81-82 (Tex. 2008).   Specifically, section 61.018 provides that an employer may not withhold or divert any part of an employee's wages unless a specifically enumerated exception applies.   Tex. Lab. Code Ann. § 61.018.   Chapter 61 subjects employers to criminal penalties under certain circumstances and allows the attorney general of Texas to seek injunctive relief against employers who repeatedly fail to pay wages.   See id. §§ 61.019-.020.

Chapter 61 also allows employees who have been denied wages to file wage claims with the Texas Workforce Commission ("TWC"). See id. §§ 61.050, 61.001(1); see Igal, 250 S.W.3d at 82.   This statutory remedy, however, "is not an employee's sole and exclusive remedy for a claim based on past wages but is rather an alternative remedy that is cumulative of the common law."  Igal, 250 S.W.3d at 88 (citing Holmans v. Transource Polymers, Inc., 914 S.W.2d 189, 192 (Tex. App.—Fort Worth 1995, writ denied)).   Actions filed with the TWC "do not abrogate common law claims against employers for an alleged failure to pay compensation."  Id.  Because the TWC's procedures are designed to resolve claims expeditiously and

inexpensively, id. at 82, the TWC option "provides a streamlined process for obtaining relief to workers with smaller claims that might be too cumbersome to pursue in court[,]"   Abatement Inc. v. Williams, 324 S.W.3d 858, 863 (Tex. App.—Houston [14th Dist.] 2010, pet. denied.) (citing Igal, 350 S.W.3d at 82, 87).  An employee who has been denied wages thus has the option of either filing a wage claim with the TWC or filing a common law breach-of-contract claim in court.  See Igal, 350 S.W.3d at 82; Abatement, 324 S.W.3d at 863; Holmans, 914 S.W.2d at 193-94.  Here, the plaintiff has alleged a claim for violation of Chapter 61 of the TLC but has not alleged a claim for breach of contract, and there is no evidence before the court that plaintiff has filed a wage claim with the TWC.

In Texas "[w]hen a private cause of action is alleged to derive from a constitutional or statutory provision, [the court's] duty is to ascertain the drafters' intent."  Brown v. De la Cruz, 152 S.W.3d 560, 563 (Tex. 2004).  Since Chapter 61 of the Texas Payday Act does not expressly provide a private right of action, the plaintiff can only sustain her claim under Section 61.018 if a private right of action is implied by the provisions set out in Chapter 61.  Under the "strict construction" rule applied by Texas courts "causes of action may be implied only when a legislative intent to do so appears in the statute as written."  Id. at 567. Chapter 61 creates a detailed administrative enforcement scheme through the TWC and allows the possibility for enforcement by the

attorney general.  Abatement, 324 S.W.3d at 864; Tex. Lab. Code
Ann. §§ 61.020, 61.051–.067.  There is nothing within Chapter 61
that suggests an intent to also allow a plaintiff to invoke its
provisions through a private right of action, especially given the
existence of the available administrative remedy.  Moreover,
Chapter 62 of the Texas Payday Law expressly allows for a private
cause of action for an employer's failure to pay minimum wage.  See
Tex. Lab. Code Ann. §§ 62.203–.205; see also Abatement, 324 S.W.3d
at 865 ("The legislature's express inclusion of a private right of
action in chapter 62 and omission of that language in chapter 61
strongly suggests that the legislature did not intend a private
right of action under chapter 61.") (citing Brown, 156 S.W.3d at
568).  Employees who have been denied wages can file a wage claim
with the TWC or pursue common law claims in court, but the language
in Chapter 61 does not suggest an intent to allow employees to
bring a private right of action for violations of Chapter 61's
provisions.  See Igal, 350 S.W.3d at 82.  Accordingly, defendant is
entitled to summary judgment on the claim that plaintiff has
asserted under Chapter 61.

### III.  Defendant's Motion to Strike

Defendant has also filed a motion to strike and objections to
the declaration that plaintiff attached to her response in
opposition to defendant's motion for summary judgment.  In support
of its motion defendant asserts that plaintiff had an opportunity

-63-

to supplement her interrogatory responses as well as to correct any deficiencies in her deposition testimony, but that instead, she attached to her response in opposition to the motion for summary judgment a declaration that is a "sham" effort to create a fact issue based on conclusory statements, speculative opinions, inadmissible hearsay, and legal conclusions that should not be allowed.  For the reasons stated in the previous sections of this Memorandum Opinion and Order, the court has already concluded that even considering the evidence provided in plaintiff's declaration defendant is entitled to summary judgment, the court concludes that defendant's motion to strike and objections to the declaration should be denied.

## IV.   <u>Conclusions and Order</u>

For the reasons stated above, Defendant Harris County Hospital District's Motion for Summary Judgment and Supporting Memorandum of Law (Docket Entry No. 46) is **GRANTED,** and Defendant's Motion to Strike and Objections to Plaintiff's Declaration in Response to Defendant's Motion for Summary Judgment (Docket Entry No. 60) is **DENIED.**

**SIGNED** at Houston, Texas, on this the 7th day of March, 2013.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-64-